**Arthur Dale WHITE, et al.**

v.

**NATIONAL STEEL CORPORATION.**

**Civ. No. 83-0059-W.**

United States District Court,
N.D. West Virginia.

Aug. 30, 1989.

that he was offered the opportunity by National to move from a union position to a non-union management position, exempt under the Fair Labor Standards Act,[2] and accepted the promotion only after National representatives made certain express or implied promises. Plaintiffs contend they were each told that in the event of a management layoff or in the event one of them could not handle the management position, or did not like it, that employee could return to his prior hourly or non-exempt position. In addition, plaintiffs allege that each of them was promised that management layoffs would be based on an employee's company date seniority (*i.e.*, his date of hire) as applied company-wide, rather than upon the "exempt" seniority date (*i.e.*, the date of promotion to the management position).

At various times in 1982, each plaintiff was laid off based upon his management seniority date, and no plaintiff was permitted to return to his formerly-held union position. Plaintiffs assert that had they been permitted to return they would not have been laid off from the union positions based upon their company date seniority. Alternatively, they state that their layoffs would have been for shorter periods of time than occurred after their layoffs from exempt positions.

In addition to their breach of contract claims, plaintiffs assert that National's actions add up to fraudulent misrepresentations, and/or concealments designed to induce employees to accept management positions, and that, at the least, National committed a constructive fraud when it failed to notify plaintiffs that it was negotiating in 1980 with the bargaining units to prohibit the transfer of foremen and other employees promoted to management positions to their former union positions on the occasion of layoffs from management positions.

Plaintiffs have filed a partial motion for summary judgment with regard to liability

---

Henry C. Berns, William P. Bresnahan, Stanley J. Wolowski and Rothman, Gordon, Foreman and Goudine, P.A., Pittsburgh, Pa., for plaintiffs.

Carl N. Frankovitch, Carl H. Hellerstedt, Jr., John A. McCreary, Jr. and Volk, Frankovitch, Anetakis, Recht, Robertson & Hellerstedt, Pittsburgh, Pa., for defendant.

FRANK A. KAUFMAN, Senior District Judge.[*]

Plaintiffs are sixty-two former employees of the Weirton Division of National Steel Corporation ("National") who have brought suit against National for breach of contract, fraud, and intentional infliction of emotional distress.[1] Each employee claims

---

[*] Frank A. Kaufman, Senior U.S. District Judge for the District of Maryland, sitting by designation.

1. On January 11, 1984, after the initiation of this suit, National sold substantially all of its assets in the Weirton plant to the employee-owned Weirton Steel Corporation. The implications of that sale are discussed *infra.*

2. 29 U.S.C. §§ 201–19.

in connection with their breach of contract and fraud claims. Defendants have also filed a full motion for summary judgment. Both parties also filed supplemental motions for summary judgment relating to certain plaintiffs who were unintentionally omitted from certain counts in the complaint. This Court held several hearings with counsel—in Baltimore, Pittsburgh, and over the telephone—during which it requested and subsequently received extensive supplemental briefing. This opinion finalizes and clarifies this Court's tentative holdings and findings during those hearings.[3]

The extensive allegations of the Second Amended Complaint, most of which are wide-ranging and detailed, are set forth in thirteen separate counts, each involving a different set of plaintiffs and distinct claims. The first four counts allege various breach of contract claims with respect to different groups of plaintiffs. In Count One certain plaintiffs assert:

70. In order to induce each of the aforesaid Plaintiffs to accept Defendant's offer to leave his hourly position and become employed as a salaried employee, Defendant, through its authorized agents, servants, or employees, made the following express and/or implied promises to each of the aforesaid Plaintiffs:

a. Future layoffs, terminations, and recalls specifically affecting each Plaintiff and pertaining to reduction and/or increase in the Defendant's work force would be determined upon the presently existing seniority rights acknowledged by Plaintiffs and Defendants, including "company-date seniority," which date was agreed upon as the date such Plaintiff commenced his initial hourly, rather than subsequent salaried employment with the Defendant;

b. Defendant would effectuate, apply, enforce, and maintain its promise to each Plaintiff that his "company date seniority" would be utilized as company-wide seniority, rather than departmental or job seniority;

c. Each Plaintiff would also have the option of returning to an hourly position in the event of future reductions in the Defendant's salaried work force based upon company date and company-wide seniority;

d. Defendant would ensure that each Plaintiff's acceptance of its offer of a salaried position would not result in any loss of company-wide seniority or otherwise jeopardize such Plaintiff's continued company-wide employment with Defendant;

e. Each Plaintiff would be laid off, terminated, and/or recalled in accordance with his seniority on a company date and company-wide seniority basis;

f. Defendant would deal fairly and act in good faith regarding all aspects of Plaintiff's employment;

g. Defendant would continue to employ Plaintiffs until mandatory retirement age unless Defendant had specific, just, and lawful cause to terminate Plaintiffs.

The actions giving rise to the alleged breaches are listed in Count One at paragraph 73:

73. On or about August 1, 1980, and thereafter Defendant breached its promise to Plaintiffs by unilaterally:

a. Amending each Plaintiff's existing seniority rights:

b. Reducing each Plaintiff's company date and company-wide seniority to salary date and salaried exempt seniority;

c. Failing to effectuate, apply, enforce, and maintain each Plaintiff's "company-date seniority" as company-wide seniority;

d. Rescinding each Plaintiff's right of option to return to an hourly position in the event of reduction in Defendant's salaried work force;

---

**3.** The first hearing was held in Baltimore on July 5, 1988. References to that transcript will hereafter be noted as "Tr. 1." A telephone conference was held the following day, July 6, 1988.

("Tr. 2"). Another hearing was held in Pittsburgh, Pa. on August 12, 1988 ("Tr. 3"), and telephone conferences were held on August 19, 24, 26, and 31, 1988. ("Tr. 4–7").

e. Jeopardizing each Plaintiff's continued company-wide employment;

f. Rescinding each Plaintiff's right to be laid off, terminated, and/or recalled in accordance with seniority on a company date and company-wide seniority basis;

g. Acting unfairly and in bad faith regarding aspects of each Plaintiff's employment, including but not limited to failing to provide various Plaintiffs reasonable prior or subsequent notice and opportunity to return to an hourly position;

h. Rescinding each Plaintiff's right to continued employment until retirement by reason of Defendant's aforementioned acts and conduct in "a" through "g."

Count One does not refer to any rights or obligations stemming from any collective bargaining agreement ("CBA"). However, as discussed *infra*, plaintiffs allege that their right to return to the hourly work force was obtained as an express or implied promise from National when each Count One plaintiff accepted a management position.

In Count Two, certain plaintiffs essentially reassert the same type of claims alleged in Count One by other plaintiffs, except that Count Two does not state allegations that National promised the Count Two plaintiffs that they had an option to return to an hourly position.

Count Three restates the Count One allegations regarding promises made to the Count Three plaintiffs, including the promise of a return option to the nonexempt salaried ranks.

Count Four reasserts essentially the allegations in Count One regarding the Count Four plaintiffs, and also asserts that National promised that hourly employees would not replace any Count Four plaintiff while any such plaintiff was laid off. There is no allegation in Count Four of a promise to return a Count Four plaintiff to the nonexempt salaried ranks in the event of a management layoff, since no Count Four plaintiff was ever employed as nonexempt personnel.

Count Five alleges fraudulent misrepresentations by National to most but not all of the plaintiffs. Count Five plaintiffs assert that National agents told them that they could always return to the bargaining units when, in fact, National's policy at the time of such statements was that plaintiffs had no right under any circumstances to return to the bargaining unit.

The Count Six plaintiffs also allege fraud on the part of National for its alleged failure to disclose that National's layoff policy did not list company time as the seniority determinant for management layoffs.

The plaintiffs in Counts Seven and Eight allege constructive fraud, specifically that National allegedly failed to notify these plaintiffs that it intended to negotiate a provision in the CBAs which would prohibit plaintiffs from returning to the bargaining units in the event of layoffs.

Count Nine alleges a breach of National's alleged promise that all management layoffs would be governed by company time.

Count Ten realleges the breach of contract claims in Counts One through Nine as independent torts.

Count Eleven alleges the tort of outrageous conduct and intentional, wanton infliction of harm.

Count Twelve alleges a claim of intentional infliction of emotional distress.

Count Thirteen alleges a claim for violation of a substantial public policy of West Virginia.

In this opinion, this Court addresses each of the legal issues present in this case in the context of the summary judgment motions filed by the parties and the teachings of *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A summary of the legal holdings and the disposition of the claims by each plaintiff in each count are set forth in an Order of even date with this opinion.

## CONTRACT CLAIMS

National raises two affirmative defenses against plaintiffs' contract claims—that is, the claims stated in Counts 1-4 of the Second Amended Complaint. First, National asserts that certain claims require interpretation of existing CBAs and therefore are preempted by federal labor law. Second, National contends that the West Virginia statute of frauds bars the enforcement of the contractual rights asserted by plaintiffs in those four counts.[4] As to the first such contention, National, if its prevails in that connection, is entitled to summary judgment with respect to all preempted claims because plaintiffs asserting any such claims in this case did not institute this case before the running of the applicable six months' limitations period.[5]

*Preemption Under Federal Labor Law*

National argues that a number of the counts in the Second Amended Complaint which assert the existence of employment contracts rely in fact upon the right of plaintiffs to return to the bargaining units and exercise full seniority rights in those units. National maintains that resolution of those claims will require an interpretation and application of the terms of the CBAs relating to the units to which each plaintiff sought—or would have sought—to return, since the ultimate source of any right to return to a unit is a CBA. Be-

cause plaintiffs' claims are so deeply intertwined with the CBAs, National contends that any contract or tort claim brought under state law which asserts a right to return to a collective bargaining unit is preempted by federal labor law.[6]

29 U.S.C. § 185(a), better known as section 301 of the Labor–Management Relations Act ("LMRA"), provides in relevant part:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect of the amount in controversy or without regard to the citizenship of the parties.

The Supreme Court has noted that "[s]tate law does not exist as an independent source of private rights to enforce collective bargaining contracts," *quoting Avco Corp. v. Machinists*, 376 F.2d 337, 340 (6th Cir.1967), *aff'd*, 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968), and has concluded that when "[t]he heart of the [state law] complaint [is] a . . . clause in the collective bargaining agreement," the complaint arises under federal law. 390 U.S. at 558, 88 S.Ct. at 1236. Further, the Court emphasized that "Section 301 gov-

---

**4.** Under West Virginia conflict of laws principles, "[t]he law of the state in which it was made and to be performed governs a contract's construction when it is involved in litigation in this state's courts." *Michigan National Bank v. Mattingly*, 158 W.Va. 621, 212 S.E.2d 754, 756 (1975). This case was filed in the Circuit Court of Hancock County, West Virginia on April 29, 1983, and was removed by National to the U.S. District Court for the Northern District of West Virginia on May 23, 1983, pursuant to 28 U.S.C. § 1441(c). Defendant filed a Motion to Dismiss on May 31, 1983. The complaint was amended in 1984, both parties conducted discovery in 1985 and 1986, and plaintiff filed a second amended complaint in 1987.

Although a number of parties are citizens of states other than West Virginia, there is no dispute that the alleged contracts were entered into and allegedly breached in West Virginia, whose law therefore governs the contract claims. *See generally Klaxon Co. v. Stentor*

*Electric Manufacturing Co., Inc.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

**5.** *See* the discussion *infra* at p. 327.

**6.** The plaintiffs alleging contract breaches appear to divide into three groups: (1) former members of the plant and maintenance workers unit ("P & M unit") (41 plaintiffs); (2) former members of the salaried-nonexempt workers unit ("SNE unit") (16 plaintiffs); and (3) employees who were hired directly into management without having been promoted from either the P & N or SNE bargaining units (2 plaintiffs).

Apparently, the P & M workers had been represented by the Independent Steelworkers Union ("ISU") since the late 1940's. In September of 1978, that union was also certified as the representative for the SNE workers. Members of the SNE unit were first covered by a CBA when the ISU negotiated an agreement effective August 30, 1979.

erns claims founded directly on rights created by collective-bargaining agreements, and also claims 'substantially dependent on analysis of a collective-bargaining agreement.'" *Caterpillar Inc. v. Williams*, 482 U.S. 386, 394, 107 S.Ct. 2425, 2431, 96 L.Ed.2d 318 (1987), *quoting Electrical Workers v. Hechler*, 481 U.S. 851, 859 n. 3, 107 S.Ct. 2161, 2166–67 n. 3, 95 L.Ed.2d 791 (1987).

In *Caterpillar*, the employees claimed that oral promises "created 'a total employment agreement wholly independent of the collective bargaining agreement pertaining to hourly employees.'" 482 U.S. at 389, 107 S.Ct. at 2428 (quoting the complaint). Justice Brennan wrote that: "Section 301 says nothing about the content or validity of individual employment contracts," and concluded that "a plaintiff covered by a collective-bargaining agreement is permitted to assert legal rights *independent* of that agreement, including state-law contract rights, so long as the contract relied upon is *not* a collective-bargaining agreement." *Id.* at 394–96, 107 S.Ct. at 2431 (emphasis in original). With regard to the company's contention that "the state court will have to examine the collective bargaining agreement as part of its evaluation of the 'totality of the parties' relationship,'" Justice Brennan stated that the employees relied "on contractual agreements made while they were in managerial or weekly salaried positions—agreements in which the collective-bargaining agreement played no part." *Id.* at 395 n. 9, 107 S.Ct. at 2431 n. 9. Therefore, since their complaint was "not substantially dependent upon interpretation of the collective-bargaining agreement[, nor did it] rely upon the collective agreement indirectly, nor [did] it address the relationship between the individual contracts and the collective agreement," *id.*, the employees' claims were not preempted.

In contrast, *Electrical Workers v. Hechler*, 481 U.S. 851, 107 S.Ct. 2161, 95 L.Ed.2d 791 (1987), *quoted in Caterpillar*, does present a situation in which the CBA played a critical role in the resolution of a claim. In *Hechler*, an electrical apprentice alleged a breach of duty against her union in a case originally brought in a state court and later removed to federal court. Justice Blackmun, noting that "a tort claim 'inextricably intertwined with consideration of the terms of the labor contract' is pre-empted under Sect. 301," 481 U.S. at 858, 107 S.Ct. at 2166 (quoting *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 213, 105 S.Ct. 1904, 1912, 85 L.Ed.2d 206 (1985)), concluded that the source of the union's duty to the employee would be found in the CBA, since common law imposed such a duty only on the employer. Since, therefore, "[i]n order to determine the Union's tort liability ... a court would have to ascertain ... whether the collective-bargaining agreement in fact placed an implied duty of care on the Union ... and [determine] the nature and scope of that duty," *id.*, 481 U.S. at 862, 107 S.Ct. at 2168, "'questions of contract interpretation ... underlie any finding of tort liability.'" *Id.* (quoting *Allis–Chalmers*, 471 U.S. at 218, 105 S.Ct. at 1915). The plaintiff in *Hechler* was accordingly held to be "precluded from evading the preemptive force of Sect. 301 by casting her claim as a state-law tort action." *Id.*

In situations in which employees bring suit under contracts allegedly formed separate from existing CBAs, case law suggests that preemption is appropriate when: (1) the facts demonstrate the employees relied upon the provisions of a CBA at the time the contract with the employer was made, and (2) the terms of the alleged contractual claim relate to the terms of employment in a union position, and the matter at issue is addressed in a CBA.[7]

7. The possible unfairness to litigants, such as plaintiffs here, who assert oral contract made in ignorance of collective bargaining constraints, runs headlong into the strong federal interest in the peaceful conduct of relationships between labor and management, an interest anchored by federal support for the collective bargaining process. In *Allis–Chalmers*, the Supreme Court outlined as follows the philosophy behind the preemptive reach of section 301:

> Were state law allowed to determine the meaning intended by the parties in adopting a particular contract phrase or term, ... [t]he parties would be uncertain as to what they were binding themselves to when they agreed to create a right to collect benefits under

In *Holland v. National Steel Corp.*, 791 F.2d 1132 (4th Cir.1986), plaintiff, a former National employee, appealed, *inter alia*, from a grant of summary judgment as to her claim that, when she was promoted out of the bargaining unit to management, she and National had entered into an employment contract that guaranteed her the right to return. Judge Sprouse summed up her contract allegations:

> The gravamen of Holland's claim is that she and National entered into an employment contract which provided her the right to return to hourly employment and that National's subsequent collective bargaining agreement with the [Union] did not alter her personal contract. The district court found, however, that the basis of her previous right to return to hourly employment was the 1977 collective bargaining agreement between [the Union] and National, and that the 1980 agreement subsequently eliminated that right. We agree with the district court ... that National was entitled to summary judgment on the claim.

791 F.2d at 1134. The plaintiff in *Holland*, however, apparently relied upon her understanding of the return rights contained in the CBA as the basis for her right to return. There is no indication that Holland had entered into an oral or written contract with National which was wholly separate from the union agreement.

Likewise, supervisory personnel in *Cooper v. General Motors Corp.*, 651 F.2d 249 (5th Cir.1981), had relied on provisions of a CBA that permitted them to continue to use their seniority dates in the bargaining unit after being promoted to a non-unit position. The supervisors sued the union (for breach of the union's duty of fair representation) and General Motors for agreeing to a new contract which eliminated those positions. Plaintiffs asserted no contract claim separate and apart from the union agreement regarding the seniority issue. In response to plaintiffs' argument that their seniority rights had become vested under the earlier CBA, Judge Rubin noted that since "seniority rights are the creature of collective bargaining, we hold that what the contract confers, a later contract, validly made, may take away." 651 F.2d at 249.

The employees who sued in *Bale v. General Telephone Co. of California*, 795 F.2d 775 (9th Cir.1986), alleged that they had been led to believe that the period of "temporary" employment which they were offered was effectively a probationary period, at the end of which they would become regular union employees. The union's CBA with General Telephone provided for a hiring preference to be given to regular workers on leaves of absence over "temporary" employees. Since plaintiffs were members of the union bargaining for a

certain circumstances. As a result, it would be more difficult to reach agreement, and disputes as to the nature of the agreement would proliferate. Exclusion of such claims "from the ambit of Sect. 301 would stultify the congressional policy of having the administration of collective bargaining contracts accomplished under a uniform body of federal substantive law." *Smith v. Evening News Assn.*, 371 U.S. 195, 200 [83 S.Ct. 267, 270, 9 L.Ed.2d 246] (1962).

471 U.S. at 211, 105 S.Ct. at 1911. In *Kern v. United Steelworkers of America, Local 1688*, 669 F.Supp. 701, 704 (M.D.Pa.1987), the district judge summed up the policy reasons behind preemption in cases in which independent contracts implicate terms of a CBA:

> Our conclusion that the seniority term of the oral contract cannot be enforced under state law even though it is not, according to plaintiff, inconsistent with the terms of the collective bargaining agreement is supported by our concern for enforcing federal requirements such as exhaustion of grievance or arbitration remedies, and for enforcing a uniform and balanced six-month statute of limitations. If employees were free to negotiate and enforce separate oral agreements identical to the collective bargaining agreements under which they labored, and then if they were permitted to enforce these oral agreements under state law, much of the federal concern for swift resolution of disputes through grievance and arbitration procedures, or through immediate court intervention, and for consistent interpretation of contract terms would be undermined. Plaintiffs would be free to rely on longer state statutes of limitations, and they would be free to ignore grievance/arbitration procedures. The uniform federal common law growing out of the Labor Management Relations Act that courts have been so careful to protect would be circumvented and ineffectual.

(Citations omitted).

union job, the terms of any independent contract could not be inconsistent with the CBA. Furthermore, plaintiffs would be required to show that "the terms of the collective bargaining agreement differed significantly from the individual employment contracts they believed they had made." *Bale*, 795 F.2d at 780. Thus, a court would have to interpret the CBA in order to resolve the dispute, and preemption was appropriate. Plaintiffs in this case, unlike those in *Holland* and *Cooper*, however, rely not on a CBA, but rather on alleged contracts made separately from any union agreement. Moreover, plaintiffs' alleged contracts relate to management, not bargaining unit, positions and the provisions of the CBAs do not reach the former. However, despite the fact that the employees in the instant case were negotiating for terms and conditions of management positions which are not covered by CBAs, a problem of conflict with provisions of the union contracts still exists.

In *Malia v. RCA Corp.*, 794 F.2d 909 (3d Cir.1986), the president of a local union accepted a promotion from his union position to a management job on the basis of oral representations which included, *inter alia*, the option to return to the bargaining unit if plaintiff was not satisfied with his new position. His request to return three weeks later was denied. The district court concluded that Malia's contract and tort claims were preempted by section 301. The Third Circuit disagreed. The district court apparently determined that resolution of Malia's claims would require interpretation of a CBA provision. On appeal, Judge Gibbons, noting that the provision in question governed the issue of seniority *if* an employee returned to the unit, not the right of an employee to return in the first place, wrote that Malia's

> oral contract is a completely separate agreement from the collective bargaining agreement. In addition this oral contract is not preempted by the rule prohibiting members of a collective bargaining unit from negotiating inconsistent individual

contracts. Although Malia was a member of Local 178 when he negotiated the alleged oral contract, the oral contract relates to the job of inventory supervisor—a management position outside the Local 178 bargaining unit. Nothing in the LMRA prevents an individual—whether that individual is to be newly hired or promoted from a bargaining unit—from negotiating an employment contract for a management position. Nor does LMRA prevent an individual—whether an applicant for new employment or a current employee in a supervisory position—from negotiating for a job in a bargaining unit so long as that employment will be on the terms and conditions set forth in the collective bargaining agreement.

794 F.2d at 913 (footnote omitted).

In the instant case, as in *Malia*, plaintiffs' alleged oral contracts are completely separate agreements from the CBAs; plaintiffs were negotiating employment contracts for management positions; and the record suggests that at the time the alleged oral contracts were made, *one* CBA did not address the issue of whether an employee could return to the unit or, if such employee could so return, whether his seniority status upon such return would give him the benefit of all employment time both in the unit and in the management position.[8] However, whether the "terms" of the alleged oral accords were or were not inconsistent with the CBAs at the time the oral contracts were made, the CBAs were later amended on August 1, 1980 (for employees in the P & M unit) and on August 25, 1982 (for employees in the SNE unit). Those amendments permitted an employee to return to a bargaining unit only if: (1) no bargaining unit employees were on layoff and (2) the reason for the return was other than a reduction in the management position occupied by the employee prior to his desired return. The amendment also limited an employee's seniority upon return to that held by the employee

8. The SNE unit CBA apparently did not address the right-to-return issue although that CBA did contain provisions relating to seniority in the unit *if* an employee returned. Those provisions, and the same or similar provisions in the P & M CBA, are discussed in greater detail *infra*.

before he transferred out of the unit. Those amendments effectively prohibited a management employee from returning to a bargaining unit when unit employees were laid off.

In *Kern v. United Steelworkers*, 669 F.Supp. 701 (M.D.Pa.1987), the plaintiff sued the union and his employer for breach of an employment contract and the union for breach of the latter's duty of fair representation under section 301 and section 9(a) of the LMRA. Kern alleged that he was offered a promotion to a management job and was promised that he could be reinstated in his old bargaining unit job should something go wrong with his management position. The CBA governing Kern's old job contained the same language regarding return and seniority status which was present in *Malia*—*i.e.*, the agreement was silent as to any right to return and only spoke to seniority status *if* an employee returned. Kern was returned to his bargaining unit position after he was laid off from his management position. Kern argued—as do plaintiffs in the instant case— that the company's promise implied a guarantee that he would be reinstated to the bargaining unit with full company seniority rights. The company did not, however, treat Kern as if he had accumulated any seniority rights after his return to the unit. Judge Herman held the seniority promise to be unenforceable, noting that the Third Circuit in *Malia*

> expressly stated that the Labor Management Relations Act does not prevent an employee from negotiating an agreement for a job in the bargaining unit separate from the collective bargaining agreement, but that the agreed-upon-employment must "be on the terms and conditions set forth the collective bargaining agreement." Seniority and its accumulation is an express term of the collective bargaining agreement in the instant case. Plaintiff's reinstatement, therefore, could only be governed by the terms of that agreement, not by the

> terms of the oral contract, even if the seniority terms are identical. Plaintiff cannot, therefore, sue to enforce the seniority term of the oral contract, even though he could have enforced the reinstatement terms, had that term been breached.

669 F.Supp. at 704 (citation to *Malia* omitted).

The rationale stated in *Kern* would appear applicable in the instant case. Regardless of whether plaintiffs were aware of the terms of the CBAs which covered them as employees in the bargaining unit, and which would cover them again if they returned to that unit after work in a management job, Judge Gibbons' approach in *Malia*, which requires that any independent oral contract between an employee and management not be inconsistent with the terms of a CBA, also stresses that nothing in the LMRA prevents employees from negotiating an employment contract for a management position. *Malia*, 794 F.2d at 913.[9]

Plaintiffs in this case allege that each of them entered into an oral employment contract with National regarding the terms and conditions of the management position each was offered. To the extent, however, that these terms and conditions address issues covered by the CBA in the bargaining unit to which each plaintiff would return in the event of management layoffs, plaintiffs were "negotiating for a job in a bargaining unit." *Malia*, 794 F.2d at 913. Such negotiations are proper "so long as that employment will be on the terms and conditions set forth in the collective-bargaining agreement." *Id.* Thus, if a CBA which covered a plaintiff's bargaining unit spoke to the right of such plaintiff to return and to his seniority status after return, the terms of the CBA control, even if the seniority terms in that agreement and the oral contract are identical. *Kern*, 669 F.Supp. at 704. Since the court would look to the terms of the CBA to interpret the

---

**9.** *See Caterpillar*, 482 U.S. at 396, 107 S.Ct. at 2431–32 ("[A] plaintiff covered by a collective-bargaining agreement is permitted to assert legal rights *independent* of that agreement, including state-law contract rights, so long as the contract relied upon is *not* a collective-bargaining agreement.").

right to return and the seniority status, any claim based upon a breach of those promises is preempted by section 301.[10]

In *Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988), Justice Stevens reaffirmed the principle that "if the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law ... is pre-empted...." 108 S.Ct. at 1881. In *Lingle* the petitioner was discharged for filing an allegedly false worker's compensation claim. Her union instituted a grievance pursuant to a CBA which provided that employees could not be discharged except for "just" cause and for arbitration of disputes between the employer and any employee concerning the effect or interpretation of the agreement. While arbitration was proceeding, the petitioner filed a retaliatory discharge action in state court, alleging that she had been discharged for exercising her rights under the state's worker's compensation laws. The district court concluded, and the Seventh Circuit agreed, that the retaliatory-discharge claim was "inextricably intertwined" with the collective bargaining provision prohibiting discharge without cause and that allowing the state-law action to proceed would undermine arbitration held pursuant to the CBA. Disagreeing, Justice Stevens, on behalf of a unanimous Supreme Court, rejected the reasoning of the lower courts and noted that "even if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for Sect. 301 preemption purposes." *Id.* at 1883.[11]

*Lingle* is not directly applicable to the instant case because the former P & M unit plaintiffs and former SNE unit plaintiffs allege oral contracts whose terms may be controlled by the P & M CBA or the SNE CBA. Both sets of plaintiffs contend that National representatives promised them that they could always return to their old bargaining units with full seniority for time spent out of the bargaining units restored. As *Malia* and *Kern* teach, plaintiffs in the instant case were free to negotiate for management positions not covered by a CBA. However, to the extent that a plaintiff was negotiating for a right to return to his old job, he was negotiating for a job in a bargaining unit. Such negotiation is proper, "so long as that employment will be on the terms and conditions set forth in the collective bargaining agreement." *Malia*, 794 F.2d at 913. Therefore, if the CBA which covered a plaintiff's former union position addressed the right of return and seniority status upon return, the terms of the CBA control and claims based upon the CBA provisions are preempted by section 301.

### Application of the Preemption Principles

The application of these principles to this case is complicated by three factors: (1) the plaintiffs are divided into groups covered by two separate CBAs; (2) each agreement was modified subsequent to each plaintiff's alleged oral contract and the modifications affected returns to the bargaining units and seniority status after return; and (3) not all plaintiffs allege the same promises regarding return and seniority.

---

**10.** In *Malia,* the oral contract covered an issue not addressed by the CBA—the right to return to a unit—and so a court could address the contents of that promise without looking to the CBA. In *Kern,* the plaintiff alleged a promise regarding a right to return and a promise to have full seniority restored. The CBA addressed the latter issue but not the former—and the court permitted the promise regarding return to go forward if it had been breached, but held any claim regarding seniority to be preempted.

**11.** Justice Stevens did note that "[a] collective-bargaining agreement may, of course, contain information such as rate of pay and other economic benefits that might be helpful in determining the damages to which a worker prevailing in a state law suit is entitled.... Although federal law would govern the interpretation of the agreement to determine the proper damages, the underlying state law claim, not otherwise pre-empted, would stand." *Id.,* 108 S.Ct. at 1883 n. 12 (citation omitted).

## The P & M Unit CBA

■ Prior to 1980, the P & M CBA contained a provision addressing the unit seniority which an employee would hold after a transfer out of the unit and a later return.[12] In 1980, the P & M CBA was changed effectively to prohibit the return of management personnel to the unit during periods of management or P & M layoffs.[13] The new language expressly stated that former unit members could return to the unit under certain circumstances and addressed the amount of seniority a new returnee would hold.[14]

The 1980 P & M CBA spoke to both the right of a former bargaining unit member to return to the unit and to seniority upon such a return.[15] Plaintiffs argue that the language relates only to persons who were promoted or transferred *after* October 1, 1980, and that since all P & M plaintiffs were promoted prior to that date the provision does not apply to them. As the P & M agreement prior to 1980 did not speak to a right to return, plaintiffs contend that their claims based upon a promise to return should not be preempted.

There does not appear to be any case law addressing the question of whether the existence of a later CBA provision which addressed the contract term at issue in an earlier separate oral contract is enough to trigger the preemptive effect of section 301. In this case, this Court faces the further task of determining whether the language in paragraph (b)(3)(f), *supra*, which reads "Effective October 1, 1980 an employee who is transferred or promoted ..." clearly and unambiguously does not reach and cover the P & M plaintiffs. National contends that this CBA language is ambiguous and that therefore in this case in this Court, the meaning of that language must be determined. That very act of interpretation, defendant argues, triggers the preemptive effect of section 301.

The phrase can be interpreted to mean that "an employee who is transferred or promoted to a position outside of the bargaining unit after October 1, 1980 may

12. Article VIII(b)(3) stated that the employee who returned would have full company time seniority restored—*i.e.*, he would be credited for time out of the unit as a management employee.

13. Article VIII(D)(2)(f) and (g).

14. It is not clear whether the pre–1980 P & M CBA contained express language authorizing the return to the unit of members who were promoted out to management positions. The fact that the CBA may not have addressed those issues prior to the 1980 changes does not affect the fact that the presence of those issues in the agreement after 1980 means that those post–1980 CBA terms control, even if the terms are identical to those in the alleged oral contracts. Rights of return and seniority do not permanently vest at any stage; rather they can be modified by subsequent bargaining. *Cooper v. General Motors*, 651 F.2d at 249.

15. The relevant language is as follows:
b. Continuous service upon which Company seniority is based shall be broken in the manner set forth in c. below, and by:

(3) Permanent transfer to a position with the Company excluded from the bargaining unit except as provided in Section f., below
...

f. Effective October 1, 1980, an employee who is transferred or promoted to a position outside of the bargaining unit many return to

the bargaining with full Company seniority accumulated at the time of promotion or transfer outside of the bargaining unit restored whenever:
(1) No bargaining unit employees are on Company layoff, and
(2) The reason for such return is other than a reduction in forces on the excluded job occupied by the former employee immediately prior to his or her return.
g. In the event an employee is returned to the bargaining unit under the provisions of Section D.2.f., above, he or she may return to the Department in which he or she held Department seniority immediately prior to leaving the bargaining unit whenever:
(1) No bargaining unit employees are on Departmental layoff, and
(2) Such assignment is made immediately upon the initial return to the bargaining unit. In such event, the Department seniority accumulated by the former employee at the time of leaving the bargaining unit will also be restored.
Stipulations of Plaintiffs and Defendant No. 1 and Exhibit A, App. A at pp. 946, 950.

return...." Indeed, upon a reading of the involved words, in isolation, that interpretation seems to be the most plausible meaning.

However, defendant argues that the verb "is transferred" refers to the *status* of a promoted employee after October 1, 1980. While defendant's view may not appear to be the most natural interpretation, it is a plausible one. Accordingly, this Court cannot conclude that plaintiffs' view is the only reasonable meaning which can be assigned to the provision. While "is transferred" is a verb in the present tense, it could refer to the "status" of an employee after October 1, 1980.

As extensively discussed on the record during the August 12, 1988 hearing, evidence in the record does not tend clearly to support one interpretation; indeed the record reflects the ambiguity which this Court concludes exists in the language of the return-seniority provision. Since that language is somewhat ambiguous, the meaning of the 1980 P & M CBA must be determined in this case. Plaintiffs' claims regarding the right to return and the seniority which follows such return directly conflicts with the terms of the CBA *if* those terms are applicable to these plaintiffs. Since resolution of that issue first requires that construction of the CBA provisions implicated by plaintiffs' claim be determined in this case, preemption is required. This is not a case in which interpretation of the CBA is merely "tangential" to the plaintiffs' state law claim as in *Lingle, supra*. The focus of the instant inquiry is whether the CBA provisions in question apply and preempt the state law claim—an inquiry to be conducted pursuant to federal labor law, not state contract law—and an inquiry whose outcome will be decisive as to whether plaintiffs' claims can continue at all.

This Court is not aware of any decision which distinguishes between cases in which the plaintiffs' claims implicated the provision of a CBA and in which the claims were clearly covered by provisions in a CBA. If the ability of the plaintiffs in either case to maintain their claims depends upon the interpretation of a CBA, the preemptive force of section 301 equally applies. Thus, this Court concludes that the P & M plaintiffs' claims based on a promise of a return to the unit with seniority restored are preempted.

As far as the former P & M unit plaintiffs are concerned, then, the P & M CBA addressed both the issue of whether a former P & M unit member could return as a result of a management layoff and such employee's seniority status upon return at the time he, as a former P & M member, was laid off. Thus, whether the language of the pre–1980 P & M CBA addressed those issues does not matter. To have permitted plaintiffs to return after 1980 during a time of management layoffs with full seniority would have violated the direct provisions of the modified P & M agreement—and it is that type of conflict between the provisions of independent employment contracts and the terms of a CBA which the preemption doctrine aims to avoid. The right to return to the bargaining unit and seniority upon such a return were governed by the P & M agreement after 1980. Since all plaintiffs in this group were let go after 1980, the terms of the CBA and *not* the terms of the alleged oral contracts control. Therefore, all contract and tort claims brought by former P & M bargaining unit workers related to promises to return to the bargaining unit at full seniority are preempted by section 301.

The SNE Unit CBA

When the ISU reached an agreement with National covering the SNE workers effective August 30, 1979, the CBA expressly stated that the seniority provisions contained in National's Standard Practice Manual (containing employment policies for non-union personnel) would continue to govern the SNE members until another agreement modifying that seniority language was worked out.[16] The same provision was contained in the August 1, 1980

---

**16.** *See* Exhibit D to Stipulations of Plaintiffs and Defendant filed 6/8/88.

SNE CBA.[17] National and the ISU adopted the seniority language contained in the P & M contract regarding return to the unit and seniority status thereafter in a SNE CBA effective September 25, 1983.

However, on August 17, 1982, the union issued a "Position Paper on Labor–Management Relations," indicating a large number of union concerns which the union wanted management to address. The union requested, *inter alia*, that management

Execute a Seniority Agreement with the Salary Division prohibiting the reduction of non-bargaining unit employees into the salary bargaining unit; and, further, removing those thirty (30) management employees already reduced and given full seniority heels.

App. A (Vol. 4) at 1028.

James Redline, President of Weirton, wrote a letter to union President Walter Bish, responding to each of the union's demands. In regard to the seniority and return issues, Mr. Redline wrote:

Mr. John Madigan has assured me the Industrial Relations Department is ready to resume discussions [regarding a seniority agreement] August 25, 1982. Please advise them of when you wish to begin the discussions. I also agree to put a hold on further reductions in the SNE Union until an appropriate agreement or impasse is reached.

*Id.* at 1031. That letter was dated August 24, 1982, after which no transfers occurred from management back to the SNE unit.

National has not provided any evidence which convinces this Court that Mr. Redline's letter constituted an amendment of the 1980 CBA. First, the language in the exchange of petition and letter seems to be the language of two parties bargaining towards an agreement. Indeed, the Redline letter sets a date when discussions on a seniority agreement were to begin. The "hold" on further reductions appears to have been a unilateral good faith move on National's part—one which National could have, if it had desired, rescinded if an impasse had been reached. There is no indi-

cation that Bish acknowledged Redline's letter or "offer" in any formal manner. Second, when shown the August 24, 1982 letter, Redline could not recall having seen it (*see* App. c at 59–68), although he did confirm that the ability of a salaried exempt employee to return ended on August 25, 1982. *Id.* at 64. And third, while William Doepken, Weirton's Divisional Counsel and General Manager of Labor Relations, stated that he viewed the "agreement" to hold returns as an enforceable obligation under the CBA, App. C at 75, another Labor Relations official, Robert Korbel, suggested that it was the language negotiated in the 1983 SNE CBA which *contractually* prohibited returns. App. B at 726–27.

There is no dispute that a CBA can be modified through post-execution negotiations, *see Ekas v. Carling National Breweries*, 602 F.2d 664 (4th Cir.1979), *cert. denied*, 444 U.S. 1017, 100 S.Ct. 669, 62 L.Ed.2d 646 (1980), that such negotiated amendments are fully binding, and that a party may compel arbitration in response to alleged violations of such an amendment. *See e.g., Adkins v. Times–World Corp.*, 771 F.2d 829, 831 (4th Cir.1985), *cert. denied*, 474 U.S. 1109, 106 S.Ct. 896, 88 L.Ed.2d 930 (1986). But in every such case cited by defendant, the parties had negotiated and signed a formal addendum to the CBA or memorandum of understanding. The evidence in this case does not reflect the basic elements of contract formation in offer and acceptance—the letter in the record from Redline is not even signed and, as noted above, there is no evidence of any response from the union.

Thus, at the time that the SNE plaintiffs were laid off in 1982, the seniority provisions contained in the Standard Practices Manual governed any right to return and seniority status upon a return to the unit. The Standard Practices Manual speaks to the seniority an SNE employee would hold *upon return* to the unit; however, the Manual does not appear to contain any express language regarding the right of an

---

**17.** *See* Exhibit E, *id.*

SNE employee who transfers out of the unit to return in the first place.[18]

■ In sum, while the members of a union are not barred by federal labor law from entering into independent employment contracts with management for a non-union job, union employees cannot bargain for rights which are addressed by a CBA without having any suit filed regarding those rights preempted by section 301 of the LMRA. Thus, the P & M and SNE plaintiffs, who allege that they entered into an oral contract with National which included promises permitting return to the union job and/or the retention of company seniority upon such a return, face the preemption of those claims to the extent they are addressed in the relevant CBA. All such preempted claims must be brought under the LMRA which contains a six-month statute of limitation for filing such actions. *Del Costello v. IBT,* 462 U.S. 151, 163, 103 S.Ct. 2281, 2289, 76 L.Ed.2d 476 (1983). All the claims in this case arise from events which occurred prior to 1983. That six-month time limitation has long passed. Thus, each contract claim asserted in this case which is preempted by federal law cannot now be asserted under the LMRA. Summary judgment will, accordingly, be entered in favor of the defendant on all preempted contract claims.[19]

### *Application of Preemption to Individual Contract Counts*

■ The forty-one plaintiffs in Count One are former members of the P & M unit who were promoted to management positions prior to August 1, 1980. They allege that they relied upon a number of oral representations by National agents when they accepted their promotions. Count One appears to allege a number of breaches; only the alleged breach relating to return to the bargaining unit and any "implied" full restoration of seniority upon return are preempted. (Second Amended

Complaint ¶ 70(c)). The claims relating to use of company date seniority to management layoffs do not implicate any bargaining unit agreement and are thus not preempted.

The three plaintiffs in Count Two were P & M unit employees who accepted management positions after August 1, 1980. None of those plaintiffs alleges a promise on the part of National that such employee could return to the unit in the event of a management layoff. Consequently, no claim in this count is preempted.

The fifteen plaintiffs in Count Three are former members of the SNE unit who were promoted to supervisory positions and later laid off. Those plaintiffs allege essentially that: (1) each was promised he could return to the SNE unit in the event of layoffs and could so return with full company seniority; (2) National would use company date seniority for layoffs and recalls; and (3) each such plaintiff would keep a job until retirement unless terminated for just cause. As already discussed, the SNE employees first obtained a CBA in 1979, and the 1979 and 1980 CBAs included by reference Section 6.5 of the Standard Practice Manual regarding seniority positions. Since Section 6.5 did not expressly address the right of former SNE members to return, and since no such provision was incorporated into the CBA prior to the layoffs, the claim in paragraph 98(c) of the Second Amended Complaint for a contractual promise to return is not preempted.

### *The Statute of Frauds Defense*

■ National also asserts that the West Virginia Statute of Frauds bars plaintiffs' alleged state law contract claims. That West Virginia statute states in relevant part:

No action shall be brought in any one of the following cases: ...

---

**18.** The parties provided to this Court a copy of section 6.5 of the Manual, which relates to SNE seniority. Other provisions of the Manual may perhaps relate to the right to return, but they do not appear in the record in this case, if they in fact exist at all.

**19.** National contends that all fraud claims growing out of the contract claims should also be preempted, but the fraud claims require separate analysis—an analysis to which this Court addresses itself *infra* after examination of the Statute of Frauds defense.

(f) Upon any agreement that is not to be performed within a year;

Unless the promise, contract, agreement, representation, assurance or ratification, or some memorandum or note thereof, be in writing and signed by the party to be charged thereby or his agent.

W.Va.Code § 55–1–1.

The Supreme Court of Appeals of West Virginia, in interpreting that statutory provision, has written:

The established law in this State ... is that the terms of a verbal contract must expressly or by necessary implication provide for performance beyond a year or contain nothing consistent with complete performance within a year, in order to come within the statute of frauds.

*Thompson v. Stuckey,* 300 S.E.2d 295, 297 (W.Va.1983) (citations omitted). However, "if an oral contract may, in any possible event, be fully performed according to its terms within a year, it is not within ... the statute of frauds ... and it is only necessary that the contract be capable, by reasonable construction, of full performance by one side within a year in order to remove it from the statute of frauds." *Id.* at 298.

Defendant argues that each plaintiff asserting an oral contract alleges in the complaint that National promised to employ the plaintiff until mandatory retirement age, and also contends that the contracts therefore could not be performed within one year. However, the complaint also alleges that National's employment of plaintiffs was not unconditional; National could terminate a plaintiff if National "had specific, just, and lawful cause" to do so. (*See* Second Amended Complaint, ¶¶ 70(g), 85(f), 98(g), 111(g)). Since it is possible that each contract could have been terminated by National for such cause, or for other rea-

sons, within one year of the date each plaintiff accepted a management position, the alleged oral contracts could have been performed within one year.[20] Accordingly, the Statute of Frauds does not bar plaintiffs' claims which are based upon the alleged existence of oral contracts.[21]

### *Breach of Employment Contracts—The Legal Standard*

Since at least some of plaintiffs' contract claims, at this juncture, survive National's motion for summary judgment based upon preemption, it is incumbent upon this Court next to address the legal standards in West Virginia for adjudicating claims of breach of employment contracts.

■ West Virginia adheres to the doctrine of "at will" employment which, "when unaffected by contractual or statutory provisions to the contrary, may be terminated, with or without cause, at the will of either party." *Bell v. South Penn Natural Gas Co.,* 135 W.Va. 25, 62 S.E.2d 285, 288 (1950). Those employed under oral agreements in which the expected duration of employment and potential reasons for termination were never specified, are generally considered "at will" employees. *Cordle v. General Hugh Mercer Corp.,* 325 S.E.2d 111, 112 (W.Va.1984). Nevertheless, the Supreme Court of Appeals of West Virginia has recognized that "contractual provisions relating to discharge or job security may alter the at will status of a particular employee." *Cook v. Heck's, Inc.,* 342 S.E.2d 453, 457 (W.Va.1986).

■ *Heck's* is the leading West Virginia case relating to employer modifications to the at will status of employees. In *Heck's,* the appellant contended that the employee handbook modified her contract of employment so that it would not be terminable at the will of her employer. The handbook contained evidence of a promise by the

---

**20.** Courts in other jurisdictions have noted that oral employment contracts for long-term employment do not fall within the Statute of Frauds if the contracts permit termination for cause. *See e.g., Ohanian v. Avis, Inc.,* 779 F.2d 101 (2d Cir.1985).

**21.** In the course of the hearings, National pressed the Statute of Frauds issue only with regard to plaintiffs Blair and Mrozek. (Tr. 3 at 192–94). Ultimately, this Court granted summary judgment to National with respect to those plaintiffs upon grounds entirely unconnected with the statute, without ever reaching that issue. (Tr. 7 at 4–25).

employer not to discharge those employees explicitly covered by the handbook, except for the offenses set forth in the handbook. The Court concluded:

> The inclusion in the handbook of specified discipline for violations of particular rules accompanied by a statement that the disciplinary rules constitute a complete list is *prima facie* evidence of an offer for a unilateral contract of employment modifying the right of the employer to discharge without cause. We agree that "[n]o unilateral contract arises merely by the fact that [the employer] has alerted its employees that certain conduct may form the basis of a discharge." However, it should be remembered that, by its own terms, the list of rules, the violation of which would be grounds for discharge, was described as a complete list.

342 S.E.2d at 459 (citations omitted). After summarizing "the traditional elements of contract formation," the Court noted its agreement

> with those courts that have found valuable consideration in the continued labor of workers who have in the past foregone their right to quit at any time. We conclude that a promise of job security contained in an employee handbook distributed by an employer to its employees constitutes an offer for a unilateral contract; and an employee's continuing to work, while under no obligation to do so,

constitutes an acceptance and sufficient consideration to make the employer's promise binding and enforceable.

*Id.* at 458–59. While *Heck's* involved an alleged contract based on an employee handbook, its principles are applicable to a case involving oral promises, since the traditional elements of contract formation govern both situations.

The parties disagree regarding the sweep of *Heck's*. National seems to assert that any oral promise must be very clear and definite in order to be enforceable. In contrast, the plaintiffs at times seem to argue for what might be characterized as a "contract in the air," and would find an employment contract implied by past practices and policies of National alone.[22]

*Heck's* does not support the view that an employment contract can be implied solely from past practices, in the absence of affirmative acts, promises, or written representations. Indeed, *Heck's* emphasized that, at least in the handbook area, "the offer must be definite in form and must be communicated to the offeree." 342 S.E.2d at 459 (citation omitted).[23]

In *Conaway v. Eastern Associated Coal Corp.*, 358 S.E.2d 423 (W.Va.1986), Conaway apparently claimed that a statement of general policies applicable to all salaried employees served as an employment contract which ended his at will status. While avoiding the question of whether this state-

---

**22.** The Supreme Court of Appeals has discussed the differences between express and implied contracts:

> "[B]oth express contracts and contracts implied in fact are founded on the mutual agreement of the parties and require a meeting of the minds. The former ... is one in which the terms are stated in parol or in writing, while the latter is a matter of inference or deduction; in other words, the one must be proved by an actual agreement, while in the case of the other it will be implied that the party did make such an agreement as, under the circumstances disclosed, he ought in fairness to have made."

*Case v. Shepherd,* 140 W.Va. 305, 84 S.E.2d 140, 143 (1954) (quoting 17 C.J.S., Contracts, § 3).

**23.** Once an offer has been made and terms discussed, or at least set forth, "[i]n case of doubt and ambiguity in the terms of a contract,

a court will follow the interpretation placed thereon by the parties themselves.... Although this principle is predicated upon the assumption that a valid contract exists, certainly the principle is equally applicable to the construction placed upon the proposals and counterproposals in the negotiations between the parties prior to effectuating the actual agreement." *McGinnis v. Enslow,* 140 W.Va. 99, 82 S.E.2d 437, 441–42 (1954). Moreover, a contract is not void or unenforceable because some of its terms are uncertain or vague. *See Scraggs v. Hill,* 37 W.Va. 706, 17 S.E. 185 (1893); *McGinnis, supra.* In cases where the words of a contract are not of certain and definite import, consideration will be given to the situation of the parties, the subject matter of the contract, the acts of the parties, the purpose sought to be accomplished and the surrounding circumstances. *Scraggs, supra; Wetterwald v. Woodall,* 83 W.Va. 647, 98 S.E. 890 (1919).

ment of policies did arise to a contract, the Court stated:

> Mr. Conaway also argues that his employment was not "at-will," but was governed by a contract. In [*Heck's*], we held that an employee handbook may form the basis for a unilateral contract. This rule has some application in this case. Although Mr. Conaway was not covered under the formal National Bituminous Coal Wage Agreement of 1978 because he was a foreman, he was covered by a statement of general policies which applied to all salaried employees.
>
> This document, however, merely set out an appeal procedure for discharged employees: [appeal procedure omitted]. Mr. Conaway was given his appeal and he lost. The labor policy did not guarantee an outcome, just an appeal. Therefore, even if the labor policy is construed as a contract, Mr. Conaway alleged no facts which would show a violation of it.

358 S.E.2d at 427.

Most recently, in *Collins v. Elkay Mining Co.*, 371 S.E.2d 46 (1988), the Supreme Court of Appeals addressed the breach of contract claim brought by plaintiff, who contended that he was induced by defendant to move from his union job to management by representations assuring him continued employment until reaching retirement age. He also stated he had been induced by various publications of the company which promised him financial security until retirement. The trial court rejected the implied contract theory just a few days before *Heck's* was decided. Apparently based upon the fact that an employer "handbook" existed, the majority of the Supreme Court of Appeals, in a split decision, remanded the case for proceedings in the light of *Heck's*. The Supreme Court did not address the question of the oral representations which, assumedly, were analyzed as a possible express oral contract.

The above-discussed West Virginia cases represent the existing law of that state with regard to implied employment contracts in derogation of an employee's "at will" status. Those cases go no further than to state that representations contained in an employee handbook which are clear and definite and are intended by the employer to be used by employees, can meet the normal requirements for formation of an implied contract. While language in these cases may refer to "policies" and "practices" generally, there is no indication that the principles of *Heck's* are intended to apply in any situation other than in one involving a handbook or comparable writing.[24]

Seemingly, therefore, West Virginia law requires some solid evidence that a promise consisting of ascertainable terms has been expressly made. Thus, if the terms are

---

**24.** A review of "at will" legal principles in other jurisdictions does not appear to establish a decisive trend which would help this Court determine the scope of implied employment contracts in West Virginia. *See Barger v. General Electric Co.*, 599 F.Supp. 1154, 1158 (W.D.Va. 1984) (and cases there cited). While many states have adopted "public policy" exceptions to the at-will doctrine, the states are generally split as to whether the terms of an employee handbook can abrogate the at-will status of employees and require termination only for cause. *See Thompson v. American Motor Inns, Inc.*, 623 F.Supp. 409, 414–16 (W.D.Va.1985) (and cases there cited). The few cases which have directly addressed allegations of past practices as the basis for an implied contract also reveal different approaches. *See Bruno v. Plateau Mining Co.*, 747 P.2d 1055 (Utah App.1987) (employer's de facto policy of not terminating for fighting insufficient to abrogate at will employment terms); *Darlington v. General Electric*, 350 Pa. Super. 183, 504 A.2d 306 (1986) (possible, if plaintiff's proffer specific enough, to find contract terms and conditions in "totality of circumstances" surrounding his hire); *Pugh v. See's Candies, Inc.*, 116 Cal.App.3d 311, 171 Cal. Rptr. 917 (1981) (appropriate to consider "total of the parties' relationship" to determine whether termination proper only for just cause).

Finally, in California, the courts have suggested that all employment at will contracts contain a duty of good faith and fair dealing, *see Tameny v. Atlantic Richfield Co.*, 27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330 (1980); *Cleary v. American Airlines, Inc.*, 111 Cal.App.3d 443, 168 Cal.Rptr. 722 (1980), but the application of that principle has been narrow. Oklahoma rejects the imposition of a good faith duty, *Hinson v. Cameron*, 742 P.2d 549, 554 (Okla.1987), as have most other jurisdictions which have considered it. *See e.g., Brockmeyer v. Dun & Bradstreet,* 113 Wis.2d 561, 335 N.W.2d 834 (1983); *Parnar v. Americana Hotels, Inc.*, 65 Haw. 370, 652 P.2d 625, 629 (1982).

vague or ambiguous, evidence of the parties' understanding and the surrounding circumstances may help determine the meaning of the terms. "[G]enerally, the existence of a contract is a question of fact for the jury ... [however] the trial court is justified in removing the issue from the jury's consideration where a *prima facie* case is lacking." *Heck's*, 342 S.E.2d at 457.[25]

The latest statement of West Virginia law in this area remains *Heck's*, a case in which the Court focussed on written policies in an employee handbook and concluded that finding a "definite promise" in the handbook to discharge only for just cause merely required application of common principles of contract law. In two decisions since *Heck's*, the Supreme Court of Appeals has not chosen to expand or to elaborate those principles. A written manual can meet traditional contract requirements because it can be viewed as an offer seeking continued work in compliance with the policies there set forth; acceptance is manifested by the employees' continued work; and consideration is provided by the fact that the employees continue to work when they have no obligation to do so. The language is written by the employer, who can be assumed to have intended the policies set forth to be accepted by the employees, and written policies addressing important terms of work—such as reasons for discharge—can reasonably be viewed by employees as legally binding, making reliance on the policies justifiable.

Past practices, by themselves, are different from written employee manuals. In the latter situation, the traditional elements of contact formation are present. There is the problem of whether the existence of a past practice—never referred to by the parties when discussing a promotion or terms of employment—can serve as an "offer." Nor are the "contents" of a past practice usually definable to the same extent of definiteness and specificity as are the promises in a manual. While the fact that employees have continued to work could provide acceptance and consideration regarding the "past practices," the lack of evidence of an offer and the terms of an offer clearly distinguish, to some extent, past practices *per se* from employee handbooks. Given the limitation of *Heck's* to handbooks, the contractual analysis of the Supreme Court of Appeals with respect to what amounts to an exception to the at will doctrine, no further explanation or expansion of the *Heck's* doctrine in West Virginia, and no clear trend in other jurisdictions, this Court concludes that the past practices alleged in this case by plaintiffs cannot, in and of themselves, give rise to a contractual change in at will status. Such past practices can, however, serve to aid the Court in the interpretation of contract terms established by express promises, oral or written, of those terms which are vague or ambiguous. Thus, in cases in which a contract term such as "seniority" is established through an express promise, past practices or policies may be utilized to help clarify ambiguities with respect to the parties' agreements. However, in the absence of an express promise, a past practice or policy not enshrined in a policy manual or writing of some sort intended for use by employees cannot serve in and of itself to establish a contractual obligation on the part of the employer.[26]

---

**25.** In this case, many plaintiffs have stated that they were promised that their "company seniority" would "continue"; what it means for company seniority to continue is vague. If there is evidence that one or both parties understood that to mean that seniority would be used for layoffs, then a plaintiff could perhaps survive summary judgment concerning the alleged promise that management layoffs would be conducted on the basis of company time seniority. However, in the absence of any reference to seniority, no such promise can be "implied."

**26.** In the course of the hearings in this matter, court and counsel discussed the possibility of certification, pursuant to W.Va.Code § 51–1A–1, *et seq.*, to the Supreme Court of Appeals of the question of whether West Virginia law recognizes an implied contract based upon an employer's past practices and policies. However, the involved and varied fact patterns in the instant case make it quite difficult for counsel to agree upon the underlying facts; consequently, counsel on both sides asked that the certification effort be abandoned. This Court reluctantly agreed.

### Evidence in the Record of Past Practices

■ Even if this Court were to conclude that past practices could establish an implied employment contract, it is not at all clear that the voluminous record before this Court establishes the scope and definiteness of those practices necessary to equal the specificity and definiteness of the promises in the handbook in *Heck's*.

The alleged "background" facts include the following: (1) in the past, National had allowed exempt employees to transfer to their former positions in the hourly or salaried nonexempt ranks with full seniority restored; (2) during work slowdowns in one department, National transferred foremen to management positions in other departments; (3) the management layoffs which did occur were based on an employee's company time; and (4) since union employees were not being promoted into significantly higher paying jobs and were losing job protection, they seemingly would have been very concerned about job seniority and would "likely" have sought answers to questions regarding seniority and layoff procedures.

There does not seem to be a dispute that prior to 1980, management employees could transfer back to the P & M or SNE ranks. The plaintiffs themselves generally relied upon hearsay and alleged "common knowledge," although most plaintiffs were personally familiar with very few employees who transferred back. For example, plaintiffs Anderson, Baker, Kruger, and Kondik each knew of one individual personally; plaintiff Dhayer himself had transferred back and knew of one other; plaintiff Barber knew of a "few people" but did not name any; plaintiff Gracie had "heard of several"; a large number of plaintiffs mentioned knowledge of employees Barkhurst and Michaux transferring back; and a large number of plaintiffs knew of no employee personally who had done so. From each individual plaintiff's perspective, then, the knowledge of a past practice concerning returns was based on little personal knowledge and a lot of alleged common knowledge.

While it is not precisely clear how many employees were returned since 1975, it seems clear that, for whatever reason, employees were returned and no employee who sought to go back was denied the opportunity.[27] The record is far less clear as to the *source* of that right, however. National has steadfastly maintained that it determined in each case if and when an employee could return. On the other hand, plaintiffs contend that National's policy was, in fact, as stated and that National guaranteed plaintiffs it would return them to the hourly ranks. Thus, plaintiffs claim that the promise is specific—that an employee could return at *such employee's* option for any reason.[28] The record contains little indication of that right in the evidence of the past practices out of which the implied contract allegedly arose. The definite and specific promise that plaintiffs had the absolute right to return is missing from the record (except for a reference by National's McCreary during the 1980 collective bargaining negotiations that employees had the "unlimited" right to go back. *See* App. B at 673). It must be remembered that the specificity and completeness of the promises in the *Heck's* handbook is an important reason why the Supreme Court of Appeals of West Virginia permitted an implied contract action to go forward in that case.

27. National has acknowledged that it transferred management employees back to the hourly ranks on and off since the 1950's and 1960's. *See* App. A at 701–03; *id.* at 761. No one could recall an employee who had been denied the right to return. *See* App. B at 728; *id.* at 704–05; *id.* at 711. There is evidence that 15 employees returned between 1977–79, *see* App. B at 729; and that 44 employees went back to nonexempt positions between 1978 and 1982, *see* App. B at 730–33. On the other hand, there is evidence that only 2 hourly employees returned to the P & M unit between 1975 and 1980. *See* App. A at 785.

28. With regard to plaintiffs' fraud claims, plaintiffs may not succeed if National controlled the right to return since National may well have intended to return each plaintiff if requested at the time the oral representation was made but reserved the right to change its mind in each given instance of a request by an employee to return.

The evidence as to a past practice that management layoffs would be conducted by company time is inconsistent. National states that former salaried nonexempt employees were returned with full company seniority pursuant to the provisions of the Standard Practices Manual, "with the approval of, and at the discretion of, management." App. A at 685. That provision was adopted in the 1980 SNE CBA and was later changed materially to restrict returns in 1983. But that latter provision relates only to SNE employees and speaks only to seniority after a return to the SNE, not seniority as a condition of layoffs in the management ranks.

Charles Lafferty, a National management employee, suggested that company seniority was "probably" the determining factor in the layoffs in 1977 and 1978, although he indicated that performance was always a factor. App. A at 529–32. Lafferty said that there was disagreement in 1978 in management about the criteria to use in layoffs that year; and that those who asked about layoffs after 1978 would probably have been told that the basis was company time. *Id.* at 534.

But the practice does not seem ever to have been uniform, based on the record evidence. For example, Clyde Gast, who was Manager of Management Development and Training, testified that he laid off employees in 1979 or 1980 on the basis of departmental, not company, seniority; he knew there was a policy but did not remember what it was. App. C at 44–46. William Johnson laid off plaintiff White in 1980 on the basis of performance. App. C at 37–40. Plaintiff Joseph Mayernick stated in reference to management policies regarding layoffs in the exempt ranks: "To my recollection, I think there were two or three that I had seen over the years with changes each time." App. C at 43. He also stated that an exempt employee in his department was laid off in 1979 on the basis of performance. *Id.* at 76–77.

The evidence pointed to by plaintiffs indicates that company time was probably the major factor in determining layoffs since 1977, but there seems to have been disagreement within management about that criteria, and performance generally seems to have been a factor. Regardless of National's policy view, however, there does not seem to be evidence that company time was recognized as the uniform practice by plaintiffs; there is an absence of the long-standing practice evidenced by personal knowledge that characterized the "return to the hourly ranks" past practice. Even if company date was the clear and unambiguous layoff policy of National, no implied contract could arise unless there is a long and consistent use of that policy of which plaintiffs were clearly aware. Only in such a case, under the principles articulated in *Heck's* and other cases, could plaintiffs reasonably rely on the practice and National be held to have recognized such reliance. That kind of evidence is lacking in this case as to the use of company time for management layoffs.

In sum, even if *Heck's* is construed broadly in favor of plaintiffs, the record in this case does not provide evidence to support the existence of past practices whose terms are definite and specific enough to give rise to an implied contract conferring upon an employee the option to return to the bargaining unit and to have company seniority in the event of management layoffs.[29]

## FRAUD CLAIMS

### Preemption Claims

█ In Counts Five–Nine, plaintiffs allege actual fraud and constructive fraud growing out of the same facts which gave rise to plaintiffs' contract claims. National argues that those claims are preempted.

---

**29.** Plaintiffs additionally admit that no plaintiff was promised that he could work until retirement age and would only be fired for just cause. *See* Plaintiffs' Brief in Opposition at 47. Since no past practices or policies support that contention and there is thus no basis for this Court to find that promise implied in any contract, plaintiffs have stated they are dropping that contention from Counts 1–3. Thus, plaintiffs' allegations in paragraphs 70(g), 85(f), and 98(g) of the Second Amended Complaint will be dismissed.

The Supreme Court of the United States has noted that questions relating to labor agreements must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort. "Any other result would elevate form over substance and allow parties to evade the requirements of Sect. 301 by relabeling their contract claims as claims for tortious breach of contract." *Allis–Chalmers*, 471 U.S. at 211, 105 S.Ct. at 1911.

In *Allis–Chalmers*, plaintiff brought a tort claim against his union for the alleged bad faith handling of an insurance claim; since the CBA contained an insurance grievance procedure which plaintiff did not use, the source of the state law claim was, in fact, the CBA, and resolution of the claim required an interpretation of that agreement in order to determine whether the union had not acted in good faith regarding its contractual insurance grievance obligations. Similarly, plaintiff's tort claim in *Hechler, supra*, alleging the duty of the union to ascertain that plaintiff was properly trained, had its source in the IBEW's CBA, if one existed, since only an employer was recognized as having such a duty under the applicable state law. Consequently the tort claims in *Allis–Chalmers* and *Hechler* were deemed preempted.

Two circuit courts have taken somewhat different views with respect to preemption in two state tort cases in which similar facts were involved. In *Bale, supra*, plaintiffs sued for fraud and negligent misrepresentation in connection with an alleged breach of an oral contract that plaintiffs would obtain the rights of regular employees after their period of "temporary" employment ended. Instead, plaintiffs were discharged pursuant to a CBA provision which gave regular employees returning from a leave preference over "temporaries" when jobs opened up. Plaintiffs acknowledged that their contract claims were preempted since their employment contracts could "be effective only insofar as they were consistent with the collective agreement." *Bale*, 795 F.2d at 779. Since the alleged contractual promises would

have to be consistent with the terms of the CBA, the court noted that to prove fraud or misrepresentation the plaintiffs would have to show that the terms which they were promised differed from the CBA, requiring the court to interpret the CBA. Thus, the fraud and misrepresentation claims were deemed preempted.

The Eighth Circuit reached the opposite conclusion on rather similar facts. In *Anderson v. Ford Motor Co.*, 803 F.2d 953 (8th Cir.1986), plaintiffs were former Ford employees whose recall rights had expired. They were brought on as new hires and subsequently "bumped" from their jobs by employees with active recall rights who were entitled to preferential hiring under the governing CBA. The Eighth Circuit noted that plaintiffs claim of fraudulent misrepresentation (plaintiffs alleged that they were told that they were being hired as permanent employees) did not derive from nor depend upon an underlying contract, and apparently concluded that since the standards for judging fraud did not derive from any contractually-established expectations of the parties, preemption was inapplicable. *Anderson*, 803 F.2d at 957. In dissent, Judge Bright asserted that to determine whether Ford's actions were fraudulent, the Court would have to address Ford's claim that it was relying on a CBA which also covered plaintiffs. Since, Judge Bright concluded, "there is no way to measure the misrepresentations alleged without examining that which has been misrepresented[,] the collective bargaining agreement[,] ... [t]here is simply no way around the inextricable meshing of the collective bargaining agreement and appellants' claims." *Id.* at 960.

This Court adopts Judge Bright's analysis in *Anderson*, in that the fact that a plaintiff's fraud claim is not directly grounded in a CBA (*e.g.*, the duty to exercise good faith in connection with grievance procedures, as in *Allis–Chalmers*, or the duty to ensure proper job training, as in *Hechler*) does not mean that the claim is not preempted. If resolution of the tort allegations requires a court to interpret the provisions of a CBA (*e.g.*, to determine

whether, in fact, those provisions were misrepresented by a defendant), then the claim is preempted as "substantially dependent upon interpretation of the collective-bargaining agreement." *Caterpillar*, 482 U.S. at 394, 107 S.Ct. at 2431. Thus, in sum, if a fraud claim has its source in a duty generated by a CBA, or if a court would have to analyze the provisions of a CBA to determine the existence of an element of a fraud claim, then the preemption doctrine applies.

*Application of the Preemption Analysis*

■ In Count Five, plaintiffs argue that National representatives offered them management positions by promising plaintiffs that each could always return to the hourly bargaining unit or to the salaried ranks, nonexempt under the Fair Labor Standards Act, in the event there was a layoff or in the event the plaintiffs chose to do so for any reason whatsoever. Plaintiffs argue that those statements were false and material representations because at the time the statements were made, it was the defendant's policy that it had the sole right to transfer plaintiffs back to the hourly bargaining unit or salaried nonexempt ranks and that National would consult first with the union prior to a transfer. In order to determine whether such misrepresentation occurred, this Court would not have to review the terms of any CBA; rather, this Court would have to determine whether National's return policy was as plaintiffs state, and whether, in fact, National agents misrepresented that policy to each plaintiff, or failed to disclose the policy in response to a question regarding the procedures for layoffs. Since that inquiry does not require this Court to review or to interpret the provisions of a CBA, the fraud allegation in Count Five is not preempted by federal labor law.

In Count Six, plaintiffs allege that National told the eighteen employees named in Count Six that exempt employee layoffs would be based on company time when, in fact, since 1979, National had developed layoff policies that listed criteria, such as exempt time, as determinants of layoff status. That material misrepresentation concerns only management layoffs and does not address representations concerning any matter governed by employees under a CBA. Preemption, therefore, is not appropriate.

■ In Count Seven, plaintiffs allege that National agreed in the P & M CBA to prohibit exempt employees from returning to the P & M Unit and that National failed to take proper steps to notify each plaintiff of the CBA changes which prohibited them from returning. The alleged duty on National's part to notify each plaintiff is said to grow out of the fact that National negotiated certain provisions in the 1980 P & M CBA which were adverse to plaintiffs. In order to evaluate the existence of that alleged duty, a court must review the CBA and the particular provisions to which plaintiffs object. While plaintiffs urge that the focus in this Court is the obligation to plaintiffs growing out of the alleged promise that they could return to the collective bargaining unit, that fraud claim cannot be resolved without consideration of the 1980 negotiations and the provisions adopted by National and the union in the CBA prohibiting returns. A fraud claim so *intertwined* with the provisions of a CBA is preempted.

Count Eight faces preemption for similar reasons. The plaintiffs who bring that count claim that National had a duty to notify them that it was negotiating with the SNE unit, and later that it entered into an agreement concerning the SNE unit on August 25, 1982, to prohibit such returns. In order to determine whether that alleged duty of notification exists, this Court would need to review the 1982 SNE CBA negotiations and interpret the final CBA provisions concerning the ability of the former SNE employees to return to the SNE ranks. Since this Court would have to look to the negotiations and to the CBA provision regarding return to determine whether the allegations are correct, and whether a duty to notify was generated, that count is preempted.[30]

**30.** Plaintiffs suggest that *Lingle, supra,* stands for the proposition that a state law claim need

Count 9 restates as a fraudulent misrepresentation the claims by those plaintiffs that they were promised that their seniority as management employee was based on company time, and that exempt layoffs would be based on company date seniority. Since that fraud count only concerns promises allegedly made by National regarding plaintiffs' employment in management positions, and does not concern a promise to return to the bargaining units or seniority upon return, no CBA is implicated in the resolution of this claim. It is therefore not preempted.

Having reviewed National's preemption claims as to each fraud count, this Court now turns to a review of the individual fraud claims in the counts which survive preemption.

*Analysis of Counts Five and Six*

Generally, the essential elements in an action for fraud are that (1) the act of fraud was committed by the defendant; (2) it was material and false; (3) plaintiff relied upon the misrepresentation and was justified in relying upon it; and (4) plaintiff was damaged because he relied upon it. *Horton v. Tyree*, 104 W.Va. 238, 139 S.E. 737 (1927). A defendant can be held guilty of a misrepresentation when he makes a statement "without knowledge as to its truth or falsity, or makes it under circumstances such that he should have known of its falsity." *Lengyel v. Lint*, 167 W.Va. 272, 280 S.E.2d 66, 69 (1981). Constructive fraud, on the other hand, "is a breach of a legal or equitable duty, which, irrespective of moral guilt of the fraud feasor, the law declared fraudulent, because of its tendency to deceive others, to violate public or private confidence, or to injure public interests." *Stanley v. Sewell Coal Co.*, 169 W.Va. 72, 285 S.E.2d 679, 682–83 (1982).

■ National claims that under West Virginia law, a party suing for breach of contract cannot also sue and recover for fraud in the inducement of the contract. National is correct with respect to a party who has discovered fraud prior to any breach of the contract; that party must elect either (1) to rescind the contract on the basis of the fraud or (2) affirm the contract and thereby waive any subsequent action for fraud. A party has but one election to affirm or repudiate the contract. *See Hutton v. Dewing*, 42 W.Va. 691, 26 S.E. 197 (1896).

■ But there is no principle of West Virginia law which prohibits a party from seeking damages under both breach of contract and fraud theories when the fraud is discovered after the breach has occurred, and rescission or affirmation is no longer possible. However, the fact that a party can sue under two theories does not affect the remedies principle that "there can be only one recovery of damages for one wrong or injury ... A plaintiff may not recover damages twice for the same injury simply because he has two legal theories." *Harless v. First National Bank in Fairmont*, 169 W.Va. 673, 289 S.E.2d 692 (1982). Each plaintiff's damages under the fraud claim begin at the point when he was laid off, and includes the monetary value of the wages and other benefits associated with employment which were lost as a result of the layoff, and any damages for emotional distress. Recovery of lost wages and benefits is also the measure of recovery of damages under plaintiffs' breach of contract theory. Thus, plaintiffs may seek to establish liability under contract or fraud theories but they cannot recover duplicative damages under both— they can only recover under one theory.

---

not be preempted simply because the court must also interpret the provisions of a CBA in order to resolve the state law claim. However, plaintiffs read too much into *Lingle*. The Supreme Court did note in *Lingle* in an explanatory footnote at the end of the opinion that a state law claim could survive preemption when it may require interpretation of a CBA provision "tangentially" connected to the state-law claim; the Court cited as an example using the CBA to

help determine the amount of damages in a state-law action. *Id.*, 108 S.Ct. at 1885 n. 12. Such is not the case in Counts Seven and Eight—if a duty to notify exists, it has its source in the P & M and SNC CBAs and this Court would have to look to the negotiations of and the language in those CBAs in order to decide plaintiffs' claims. Preemption is therefore appropriate.

### (A) Constructive Fraud in Count Five

■ Plaintiffs concede that no express representations upon which a claim of actual fraud can be based were made to the eighteen plaintiffs in Count Five. Plaintiffs argue, however, that this Court should impose a constructive fraud upon National based upon the latter's failure to disclose to those plaintiffs that National had the unilateral right to determine whether a plaintiff could return to the bargaining unit. Apparently, plaintiffs also argue that constructive fraud theory as an alternative theory of liability even for those plaintiffs who claim express fraud.

Plaintiffs argue that fraud can be based upon nondisclosure of a material fact, citing *Chamberlaine & Flowers, Inc. v. McBee*, 356 S.E.2d 626 (W.Va.1987), and *Thacker v. Tyree*, 297 S.E.2d 885 (W.Va. 1982). Those cases set forth the principle that "where a vendor is aware of defects or conditions which substantially affect the value or habitability of [property or goods] which are unknown to the purchaser and would not be disclosed by a reasonably diligent inspection, then the vendor has a duty to disclose the same to the purchaser. His failure to disclose will give rise to a cause of action in favor of the purchaser." *Thacker*, 297 S.E.2d at 885; *Chamberlaine & Flowers*, 356 S.E.2d at 629. Both of those cases involved purchases of homes by the respective plaintiffs, and plaintiffs here cite no cases extending that principle of a duty to disclose into the area of employment contracts. It would appear that, in an "at will" state, a holding that the employer had an affirmative duty to disclose to prospective at will employees terms and conditions under which the employee was to be laid off, would deprive the employer of his "at will" rights. The employer's actions would, in effect, eliminate the at will nature of the employment and substitute an oral contract consisting of the terms outlined by the employer. Thus, while an affirmative misrepresentation is actionable in this context, the employer's "concealment" of layoff policies in the absence of an inquiry about them is not. *See Broussard v. CACI, Inc.–Federal*, 780 F.2d 162, 164 (1st Cir.1986) (employer's failure to reveal details of its discharge at will policy not actionable either as a half-truth or as a fraudulent concealment); *Sabet v. Eastern Virginia Medical Authority*, 775 F.2d 1266, 1270 (4th Cir.1985) (school not liable to associate professor for failure to inform the latter that the school's tenure policy differed from that of tenure policy prevalent at other institutions); Restatement (Second) of Torts § 551 (1977) (silence cannot give rise to liability for fraud in the absence of a duty to disclose).

The Supreme Court of Appeals of West Virginia has noted the general principles of law in this area:

> Constructive fraud is a breach of a legal or equitable duty, which, irrespective of moral guilt of the fraud feasor, the law declares fraudulent, because of its tendency to deceive other, to violate public or private confidence, or to injure public interests....

> Perhaps the best definition of constructive fraud is that it exists in cases in which conduct, although not actually fraudulent, ought to be so treated, that is, in which conduct is a constructive or *quasi fraud,* which has all the actual consequences and legal effects of actual fraud.... The law indulges in an assumption of fraud for the protection of valuable social interests based upon an enforced concept of confidence, both public and private.

*Stanley v. Sewell Coal Co.,* 169 W.Va. 72, 285 S.E.2d 679, 682–83 (1982). The Court noted that "in this respect, constructive fraud closely parallels the wrongful discharge in *Harless* [*v. First National Bank,* 162 W.Va. 116, 246 S.E.2d 270 (1978)], which contravened a substantial public policy principle [*i.e.,* employees should not be fired for reporting safety violations which could harm others]."

Constructive fraud is usually imposed in cases where "a fiduciary or confidential relation [exists] between the parties," but is also meant, as noted above, "to include violations of public policy or public rights or transactions affected by illegal conduct of any kind." *Miller v. Huntington &*

*Ohio Bridge Co.*, 123 W.Va. 320, 15 S.E.2d 687, 695 (1941).

As the Supreme Court of Appeals noted in *Chamberlaine & Flowers, Inc.*, 356 S.E.2d at 629, a "duty to disclose" on the part of the alleged fraud feasor arises when the fraud feasor "is aware of ... conditions which substantially affect" the plaintiff's decision, and those conditions are unknown to the plaintiff and "would not be disclosed by a reasonably diligent inspection."

No fiduciary or other confidential relationship existed between plaintiff and National. Nor is there a public policy, such as safety, implicated in National's alleged actions regarding the promotion and layoff of the plaintiffs. Plaintiffs have not asserted that National has done something illegal.

Absent such justifications for imposing constructive fraud, plaintiffs seem to argue that, since National knew that job security was important to each plaintiff, and that a unilateral right to return was an important element of employment security, National owed plaintiffs a duty to disclose its policy that National had the right to return or not to return plaintiffs after consultation with the union.

The record in this case does not reveal an "extreme situation" in which National's actions constituted "arbitrary and irresponsible behavior so egregious that failure to disclose [its return policy] would constitute fraudulent concealment." *Broussard*, 780 F.2d at 164. National's policy was that it had the right to return foremen to the bargaining units and its past practice seemed to be to return foremen who so requested or who could not handle the foreman position, at least until that right of National's was removed by the CBAs. While National perhaps should have fully disclosed the parameters of the right to return, this Court cannot conclude that this record permits imposition of a constructive fraud in the absence of the conduct at issue in cases such as *Wildes v. Pens Unlimited Co.*, 389 A.2d 837 (Me.1978), where an employer was held liable for concealing from a salesman being hired the fact that a reorganization was then underway which would eliminate the salesman's job. That National had a policy of returning foremen does not justify the assumption on plaintiffs' part that the foremen had the unilateral right to return and that National should reasonably have informed plaintiffs of the limitations National placed upon the policy. If plaintiffs were concerned about the details of the right to return, they could have asked whether National had any say in whether they could return. Apparently, that explicit question was never asked. While National's return policy does not appear to have been accessible to plaintiffs in any manual, there is no indication in the record that plaintiffs could not have ascertained the policy with reasonable investigation—such as asking a National agent. Under those conditions, this Court concludes that the Count Five plaintiffs may not prevail on the basis of constructive fraud.

(B) Actual Fraud in Count Five

Plaintiffs contend that thirty-eight plaintiffs in Count Five were promised they could always return to the hourly bargaining unit (or the salaried nonexempt ranks) in the event there was a layoff or the plaintiffs chose to do so for any reason whatsoever. Second Amended Complaint at ¶ 123. There is no doubt that all of the alleged misrepresentations were made by National's agents, so the first requirement—that the alleged fraud be made or induced by the defendant—is met for each plaintiff. Plaintiffs run into a snag, however, with the requirement that the statements allegedly made by each National agent were actually false when made.

Plaintiffs contend that while National represented to each plaintiff that he had the unilateral right to return to the bargaining unit at any time for any reason, the policy at the time each such representation was made was that National—and not the employee—had the right, in collaboration with the union, to determine whether a plaintiff could return. National does not deny the existence of the return policy as it is characterized by plaintiffs. The problem arises with the vagueness and generality of

many of the promises as set forth in the depositions and affidavits of the plaintiffs. The plaintiffs' inquiries and National's responses were rarely framed in the manner alleged by plaintiffs (*e.g.*, did each plaintiff have a unilateral right to return at the plaintiff's sole option?). Usually the questions were general (*e.g.*, could I go back if I didn't like the job?).[31]

 Fraud requires proof "by clear and convincing evidence that a representation of the defendant was false when made." *Lissmann v. Hartford Fire Ins. Co.*, 848 F.2d 50, 52 (4th Cir.1988). The burden of proof is on the party alleging fraud and " 'if the fraud is not strictly and clearly proved as it is alleged, relief cannot be granted.' " *Allegheny Development Corp., Inc. v. Barati*, 166 W.Va. 218, 273 S.E.2d 384, 387 (1980) (quoting *Board of Trustees v. Blair*, 45 W.Va. 812, 32 S.E. 203 (1899)). In order that there be actionable fraud, the representation

> must ordinarily relate to a past or existing fact, or to a past or existing fact that is alleged, and not to future occurrences. So the general rule ... is that fraud cannot be predicated on statements which are promissory in their nature, or constitute expressions of intention, and an actionable representation cannot consist of mere broken promises, unfulfilled predictions or expectations, or erroneous conjectures as to future events, even if there is no excuse for failure to keep the promise, and even though a party acted in reliance on such a promise; nor ... is the mere nonperformance of a promise evidence establishing fraud or lack of intent to perform. Predictions as to future events are ordinarily regarded as nonactionable expressions of opinion on which there is no right to rely, and obviously cannot constitute fraud where made in the honest belief that they will prove correct.

*Janssen v. Carolina Lumber Co.*, 137 W.Va. 561, 73 S.E.2d 12, 17 (1952).

The burden is on each plaintiff to demonstrate by clear and convincing evidence that he was promised that he had the unilateral right to return. If the alleged promise is vague, reflects an opinion of the National agent, or can equally be viewed as a promissory statement that National would return the plaintiff if the plaintiff desired, then the claim of fraud must fail. Plaintiffs have neither argued nor supplied evidence that National agents intentionally misled plaintiffs. Thus, each plaintiff's claims turn on the presence or the absence of clear evidence that the plaintiff was promised that he could return at *his* option.

Each plaintiff must also demonstrate that he relied upon the alleged misrepresentations, that his reliance was justified, and that plaintiff was damaged because he relied upon it.

National argues that the fraud alleged regarding a return to the units did not cause plaintiffs' injuries—that the reason each plaintiff was not returned is because the union and National negotiated away the right to return in the 1980 P & M CBA and in August 1982 for the SNE CBA; but for the changes in the CBAs, National would have agreed to return each plaintiff had he requested to be returned.

Plaintiffs claim that they were damaged because they left the bargaining units, not because National failed to return them to their former positions in the bargaining units. But for the fraudulent statements, plaintiffs assert, they would not have left the bargaining units and would not have been laid off, or would have been recalled sooner. Each plaintiff, in order to support that theory, must provide evidence to show that he would have remained in the union ranks had he known of National's official

---

**31.** Plaintiffs have steadfastly argued that National had a past practice at the time each representation was made of always returning former P & M and SNE unit members. In fact, there does not appear to be any evidence in the voluminous record before this Court of any former bargaining unit member who was not permitted to return prior to the layoffs giving rise to the

claims in this litigation. Thus, in a *de facto* sense, the representation that a plaintiff could go back was generally true—National had always sent former unit members back, although the record does not seem to reveal whether most of the past cases involved returns at the request of the employees or of National.

policy regarding returns. Therefore, as with their contentions concerning National's representations, plaintiffs are entitled to pursue their theory of the case as long as it can be supported by the facts in the record.

The heavy substantive burden which a plaintiff carries in order to demonstrate actual fraud was noted in *Steele v. Steele*, 295 F.Supp. 1266, 1269 (S.D.W.Va.1969):

> When a plaintiff contends that a party has practiced actual fraud with respect to a particular transaction, the burden is upon the plaintiff to establish the existence of fraud, and the existence of such fraud is not deducible from facts and circumstances which would be equally consistent with honest intentions. In sum, a presumption always exists in favor of innocence and honesty in a given transaction and the burden is upon one who alleges fraud to prove it by clear and distinct evidence.

(Citations omitted).

That formulation is important in this case because, as this Court has noted again and again in reviewing the plaintiffs' claims, the simple representation by National to a plaintiff that he could go back to the bargaining unit is "equally consistent" with a representation by National that National would transfer him back; such a representation, without more, will not prove fraud "by clear and distinct evi-

dence" and will not permit the claim to go to the jury.

### *The Count Six Fraud Claims*

The plaintiffs in Count Six are former salaried nonexempt and hourly employees who were promoted by National to exempt positions. They raise a number of claims of actual and constructive fraud in this count,[32] claiming both actual misrepresentations (that exempt salaried employees would be transferred, not laid off, during a slowdown, and any layoffs would be by company time), and constructive fraud (that National owed plaintiffs a duty to disclose its plans for imminent reductions and its guidelines for layoffs).

### (A) Constructive Fraud in Count Six

■ This Court has already addressed the requirements for constructive fraud. As with Count Five, National had no duty to disclose its general layoff policies to at will employees—such a requirement would automatically end the at will status of employees who could then plausibly claim under the authority of *Heck's* that National's layoff policies gave rise to an implied contract. However, National could be found to have had a duty to disclose to one or more of those plaintiffs that it was planning an imminent reduction of employees in the positions for which the particular plaintiff was to be hired. An employee could not be expected to know, or to discover,

---

**32.** The count reads:

146. When each of the aforesaid plaintiffs met with the Defendant's agents and representative regarding the acceptance of a salaried exempt position, the Defendant failed to disclose the following material facts to them:

(a) That the Defendant was actively planning layoffs of exempt workers;

(b) That the Defendant had established policies and guidelines with regard to a layoff of exempt workers;

(c) That the policies and guidelines did not specifically list company time as the determinant for exempt layoffs;

(d) At least one policy listed exempt seniority date as one of the criteria;

(e) That the policies listed length of service as a criteria; and

(f) That the company's position remains unclear whether length of service meant exempt seniority date.

147. When each of the aforesaid Plaintiffs met with the Defendant's agents and representatives regarding a salaried exempt position, each of the aforesaid Plaintiffs were told that the company would not lay off its exempt salaried employees if there was a slowdown; rather, the Defendant would transfer its exempt employees to other exempt positions throughout the mill.

148. When each of the aforesaid Plaintiffs met with the Defendant's agents and representatives regarding a salaried position, each of the aforesaid Plaintiffs were told that in the unlikely event there would be layoffs of exempt employees, such layoffs would be based on an exempt employee's company time.

149. Each of the aforesaid Plaintiffs relied upon the statements of the Defendant that a layoff of exempt employees would be based on company time and/or that there would not be a layoff of exempt employees.

management's plans to eliminate jobs in the department for which the plaintiff was interviewing. In a situation in which management offered a position to a plaintiff with knowledge (or imputed knowledge) that it was highly probable that the plaintiff would be laid off, the imposition of a constructive fraud might well be required. The application of such a principle in a given situation is, however, heavily fact-dependent. National, as noted above, did not have a general duty to disclose to its at will employees its guidelines for layoffs, regardless of whether those guidelines were developed before or after each plaintiff was offered a management position. All of the plaintiffs in Count Six were promoted between 1979 and 1981. Those plaintiffs assert that National began making preparations for major management layoffs in the summer of 1979. Each Count Six plaintiff was laid off in 1982. The fact that National recognized in 1979 that a contingency existed which might involve layoffs in the future would not, in and of itself, trigger a duty to disclose. This Court can take judicial notice that the turmoil in the United States steel industry was widely known in the late 1970s and general preparations in those years for the possibility of layoffs should hardly have come as a surprise to employees at a steel plant. Plaintiffs must demonstrate more— *i.e.,* that layoffs were planned and, in National's view, were highly likely in the management positions for which each plaintiff was to be hired.

Plaintiffs have offered evidence that National had, or began developing, layoff guidelines for exempt salaried employees in 1979. However, as far as this Court can determine, plaintiffs have not supplied or proffered any evidence in this voluminous record to indicate what National's specific plans for layoffs were in the years 1979–81. Without further evidence beyond the existence of copies of guidelines, this Court does not believe that there is enough evidence in the record to allow a constructive fraud claim to go to the jury. Consequently, National will be granted summary judgment with regard to the constructive fraud claims in Count Six.

### (B) Actual Fraud in Count Six

 The plaintiffs also allege express misrepresentations as to the following alleged promises: (1) that National would transfer rather than lay off exempt employees in the event of a "slowdown"; (2) that in the event of "layoffs" of exempt employees, they would be based on company time; and (3) that there would not be a layoff of exempt employees. A representation of a future event—the promise that exempt employees would not be laid off—is an "opinion on which there is no right to rely, and obviously cannot constitute fraud where made in the honest belief that they will prove correct." *Janssen,* 73 S.E.2d at 17. Thus, in order to prove that this representation was fraudulent, the plaintiff must show that the National agent who made it did so knowing that layoffs were going to occur or were at least highly likely to occur.

### Count Nine

The gist of Count Nine seems to be plaintiffs' claim that this Court should impose a constructive fraud upon National either because National did not disclose to them that its layoff policy was not based on company time or because National laid off each plaintiff without regard to company, time.[33]

**33.** The Count reads:

177. When each of the aforesaid Plaintiffs were offered an exempt position by the Defendant, they asked Defendant's agents and representatives about their seniority.

178. Each of the aforesaid Plaintiffs asked Defendant's agents and representatives if they would lose their seniority if they accepted a salaried exempt position.

179. Each of the aforesaid Plaintiffs were promised that they would keep their company time, they would not lose any of their company time and that they would not start off as a new employee.

180. Each of the aforesaid Plaintiffs relinquished their hourly or non-exempt position and accepted the salaried exempt position in reliance upon the promises made by Defendant's agents and representatives.

181. Each of the aforesaid Plaintiffs' vacation time was based upon his company seniority date.

182. The monthly paycheck of each of the aforesaid Plaintiffs listed his seniority as the

In connection with Count Six, this Court has refused to impose a duty upon National to disclose its layoff policies to at will employees, who could have specifically asked National's agents whether company time governed management layoffs. If such a question had been asked and a misrepresentation made, plaintiffs could have sued for actual fraud—as did many of the plaintiffs in Count Six. The record reveals that most, if not all, plaintiffs were aware that they were moving from the relative security of the union ranks to an unprotected, at will, position. West Virginia law does not establish any special relationship between employers and at will employees and, in the absence of egregious facts, this Court cannot impose a duty upon National to disclose policies which, by its very definition, the at will status does not require. The issue of company time for layoffs is the sort of policy an employee would seemingly think to inquire about, in contrast with, for example, an employer's plans to lay off employees. When plaintiffs were concerned about specific policies—e.g., return to the units—a number of them asked questions. That plaintiffs may have not asked about seniority status for layoffs, even if vacation was based on company time and even if the company date was listed on the paycheck, is not reason for this Court to impose a constructive fraud upon National for not disclosing its layoff policy. Accordingly, National is entitled to summary judgment with regard to this claim.

## OTHER CLAIMS

### Plaintiffs' Claims for Outrageous Conduct and Intentional, Wanton Infliction of Harm

■ Counts Ten through Twelve of the Second Amended Complaint allege that National's conduct in laying off plaintiffs "intentionally or recklessly subjected plaintiffs to extreme and outrageous conduct, which caused severe emotional distress in each plaintiff." (¶ 195). The Supreme Court of Appeals of West Virginia described the tort of outrageous conduct in *Harless v. First National Bank in Fairmont*, 169 W.Va. 673, 289 S.E.2d 692, 703 (1982), as follows:

> The tort of outrageous conduct or intentional infliction of emotional distress permits the recovery of damages for emotional distress arising out of extreme and outrageous conduct intentionally or recklessly caused by the defendant as indicated in Section 46 of the *Restatement (Second) of Torts:*
>
> > "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."

The Court went on to note that "the *Restatement* further defines the essential elements of this tort as follows:

> d. *Extreme and outrageous conduct*
>
> ... It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to regarded as atrocious, and utterly intolerable in a civilized community.

*Id.*, 289 S.E.2d at 703–04 n. 20.

To state the definition of the tort of outrageous conduct is to recognize that the

---

date that such Plaintiff began working for the Defendant.

183. Each of the aforesaid Plaintiffs were led to believe by Defendant's statements, representations and conduct that their seniority as an exempt employee was their company seniority.

184. Each of the aforesaid Plaintiffs were led to believe by Defendant's statements, representations and conduct that exempt layoffs would be conducted based on company date seniority.

185. Each of the aforesaid Plaintiffs were laid off based on their exempt date seniority.

186. As a result of the above described acts of the defendant, the Defendant breached an equitable duty, trust or confidence which resulted in damage to each of the aforesaid Plaintiffs and injured the public interest.

behavior of National as revealed by the record in this case comes nowhere near to meeting the requirement that "the conduct was outrageous and intolerable in that it offends against the generally accepted standards of decency and morality." *Id.* Layoffs and contract breaches are not unusual events and do not automatically reveal outrageous conduct. There is no evidence of malice in this case, or even of a deliberate attempt on the part of National management employees to mislead plaintiffs into accepting the promotions from which they were later laid off. Rather, extensive and detailed review of the several hundred pages of depositions, affidavits and answers to interrogatories reveals that the evidence against National on the contract and fraud claims is not overwhelming; indeed, National is entitled to summary judgment on a large number of those claims. Even if, as plaintiffs imply, the reduction in production at Weirton was the result of a corporate decision to shift production resources elsewhere, rather than the direct result of a recession in the steel industry, such business decisions do not reflect conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." And, while certainly not a substitute for the positions at Weirton, the layoffs were cushioned to some extent by National's Income Protection Program, which provided payments that, when coupled with unemployment compensation, totalled 75% of one's base salary for a year.[34]

For these reasons, plaintiffs' claim in Counts Ten through Twelve for outrageous conduct will be dismissed.

### Count Thirteen—Plaintiffs' Claim for a Violation of Public Policy

■ Plaintiffs allege in Count Thirteen that National's "layoff and/or failure to recall" each of the plaintiffs "contravenes a substantial public policy of the State of West Virginia." ¶ 202. Plaintiffs identify that policy as the requirement that "employers and employees must deal with each other on the basis of good faith, and in such manner as to protect the legitimate rights of both employers and employees in their relations." *Id.* at 202.

Plaintiffs do not identify the source of this "public policy." In fact, plaintiffs apparently do not address this issue at all in their briefs. No case in West Virginia has been found identifying that policy or indicating that a party can bring a cause of action for its alleged violation. Since "the existence of public policy is a question of law," *Cordle v. General Hugh Mercer Corp.*, 325 S.E.2d 111, 114 (W.Va.1984), this Court concludes that National's conduct has far from risen to the level of a violation. *Cf. Harless v. First National Bank in Fairmont*, 162 W.Va. 116, 246 S.E.2d 270 (1978) (violation of public policy when employee was allegedly discharged because of his attempt to comply with the West Virginia Consumer Protection law); *Stanley v. Sewell Coal Co.*, 169 W.Va. 72, 285 S.E.2d 679 (1981) (violation of public policy when employee was allegedly discharged for refusing to falsify reports).

### The Effect of the Sale of the Weirton Division

■ National sold substantially all of the assets of Weirton Steel to the employee-owned Weirton Steel Corporation, effective January 11, 1984. At that point, twenty-one of the plaintiffs who had been laid off by National had not been recalled. Subsequent to January 11, 1984, twelve of these plaintiffs had been recalled by Weirton Steel Corporation. Apparently, nine plaintiffs were never recalled. National

---

**34.** It should be noted that plaintiffs, if successful, can recover compensatory and punitive damages under the fraud claims in Counts Five and Six. *Harless* involved a claim for wrongful discharge, a form of constructive fraud; the court stated that "the damages are essentially the same under both claims [retaliatory discharge and outrageous conduct] since we recognize that if the employer's conduct is outrageous, punitive damages can be recovered in a retaliatory discharge suit as well as compensatory damages including an award for emotional distress." *Harless,* 289 S.E.2d at 692. The same is true in this case regarding the claims for fraud.

argues that any damages it might owe to those plaintiffs who were not recalled by the date it sold Weirton end as of the date of the sale.

Under contract law principles, a party who is the victim of breach is entitled to the benefit of the bargain as damages for the breach. That "benefit" extends to the life of the contract which was breached. The alleged employment contracts which serve as the basis for the contract and tort claims in the instant suit do not include any term defining the length of the contract, and the record does not reveal the intentions of either party as to the duration of the alleged contracts. "When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the Court." Restatement of Contract (Second) § 204. Although plaintiffs have stated that they were promised work until retirement unless terminated for just cause, plaintiffs admitted, and this Court has previously determined, that no express promise regarding the life of the alleged promises was ever made. Were such contracts as alleged actually found to exist by a factfinder, this Court would be called upon to supply the term of duration.

Numerous other courts have stated that such employment contracts "last only as long as the employee is able and willing to do satisfactory work, and as long as the employer remains in business and has work available for the employee." *McDole v. Duquesne Brewing Co.*, 281 Pa.Super. 78, 421 A.2d 1155, 1159 (1980) (and cases there cited). Since National did not maintain its steel business at Weirton after the sale, National's obligations under the alleged oral contracts, had they not allegedly been breached, would have ended the day of the sale. While the West Virginia courts apparently have not addressed this issue, West Virginia appears to follow the general rule that employment agreements with no specific duration term are terminable at the will of either party unless the employee provides some consideration beyond his employment services which would support a

claim for "permanent" employment. *See Wright v. Standard Ultramarine And Color Co.*, 141 W.Va. 368, 90 S.E.2d 459 (1955); *PEMCO Corp. v. Rose*, 163 W.Va. 420, 257 S.E.2d 885 (1979). The view of other courts that even contracts for "permanent" employment, by definition, end when the employer no longer has work available is a consistent extension of this view and a reasonable assumption as to what the parties would have agreed to had they thought to bargain with regard thereto.

It follows that if the contractual obligation of National ended when it sold the Weirton division, its liabilities for breach—both in contract and in compensatory tort—also ended on the date of the sale.